280 Md. 119 (1977)
372 A.2d 231
MARY LOUISE DAVIS
v.
JOHN FRANKLIN DAVIS, JR.
[No. 150, September Term, 1976.]
Court of Appeals of Maryland.
Decided April 12, 1977.
Motion for reconsideration filed May 11, 1977.
Denied May 31, 1977.
Certiorari denied November 7, 1977.
*120 The cause was argued before MURPHY, C.J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.
A.J.D. Schmidt, with whom was Judson R. Wood on the brief, for appellant.
John R. Foley for appellee.
Certiorari denied, Supreme Court of the United States, November 7, 1977.
DIGGES, J., delivered the opinion of the Court.
In this child custody dispute between divorced parents, we refuse to be cast in the role of a "super Solomon."[1] The chancellor, properly assuming the duty of Solomon (as is his responsibility), awarded custody of the couple's youngest child, Leigh, to the mother; however, the Court of Special Appeals ordered the young girl placed with her father. We now reverse that judgment and direct reinstatement of the chancellor's order.
The case before us is not an atypical example of the custody fights that often accompany divorces. Petitioner Mary Louise Davis and respondent John Franklin Davis, Jr. were married in 1958; three children, and nearly fifteen and one-half years later, the parties separated. To be explicit, Mrs. Davis, together with her six-year-old daughter Leigh, left the homestead on January 31, 1974, and moved into an apartment. That September, Mr. Davis filed a bill of complaint seeking a divorce a vinculo matrimonii on the ground of his wife's adultery; additionally, he requested both temporary and permanent custody of the children. Mrs. *121 Davis subsequently filed a cross-bill for divorce a mensa et thoro, for custody of the children, and for alimony and child support. Following proceedings before a domestic relations master, the Circuit Court for Montgomery County (Cahoon, J.) in March 1975 ordered pendente lite that custody of John and Mary (the two oldest children) be awarded to Mr. Davis, that custody of Leigh be awarded to Mrs. Davis, and that Mr. Davis pay $175 per month for the maintenance and support of the youngest child. The matter was heard before Judge Richard B. Latham on May 21 and 22, and by order of July 8, 1975, the court granted Mr. Davis a divorce a vinculo matrimonii; however, the chancellor reserved ruling on the permanent custody of the children. After the submission of a court investigator's report and recommendations, and following an additional hearing on December 11, 1975, Judge Latham ordered that Mrs. Davis be awarded custody of Leigh, that Mr. Davis be awarded custody of John and Mary, and that Mr. Davis pay monthly $175 to Mrs. Davis for the support and maintenance of Leigh.
Mr. Davis noted an appeal to the Court of Special Appeals; that court reversed the order of the chancellor and awarded custody of Leigh to her father.[2]Davis v. Davis, 33 Md. App. 295, 364 A.2d 130 (1976). The court reasoned that it was "not bound by the clearly erroneous rule, Md. Rule 1086, but must exercise its own good judgment as to whether the conclusion of the chancellor is the best one," id. at 301 [133], that Mrs. Davis was required, but had failed, to show "that she had repented and there was little likelihood of a recurrence of [her adulterous] actions," id. at 302-03 [134], and therefore "that the chancellor was erroneous in his determination that the best interest of the child required that custody be continued in the mother." Id. at 303 [134]. We granted certiorari. Because we disagree with both premises, as well as the conclusion, of the Court of Special Appeals, we shall reverse its judgment and reinstate the order of the chancellor.

*122 (1) Standard of Appellate Review in Child Custody Cases

Because we recognize that there are prior decisions of this Court which support the Court of Special Appeals' statement in its opinion in this case that "an appellate court ... must exercise its own good judgment as to whether the conclusion of the chancellor is the best one," 33 Md. App. at 301, 364 A.2d at 133, and inasmuch as, in line with our more recent cases, we now categorically reject this view, we feel constrained to clarify the standards of appellate review in child custody cases.
Maryland Rule 886 (applicable to this Court) and, in identical language, Rule 1086 (applicable to the Court of Special Appeals) provide the standard of review of actions tried without a jury.[3] In such actions, the appellate courts of this State "review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." Rule 886 & 1086. The "clearly erroneous" concept is no newcomer to Maryland procedure: The predecessor of Rule 886 (adopted effective January 1, 1957 as Rule 886 a), General Rules of Practice and Procedure, Part Three, III, Rule 9 c (effective September 1, 1944), contained the same scope of review embodied in the present rule; moreover, prior to the standard's codification as a rule, it was the time-honored practice on appeals to this Court in equity actions to give great weight to the chancellor's findings of fact. See, e.g., Garner v. Garner, 171 Md. 603, 614-15, 190 A. 243, 249 (1937); Sporrer v. Ady, 150 Md. 60, 70, 132 A. 376, 380 (1926). And we have heretofore noted that these rules in essence merely conformed the scope of review in nonjury actions at law to the scope of review we had always applied in equity appeals. See Greenberg v. Dunn, 245 Md. 651, 655, 227 A.2d 242, 244 (1967); Wallace v. Fowler, 183 Md. 97, 99, 36 A.2d 691, 692 (1944). *123 Nothing in Rule 886 indicates that it does not apply to all cases tried without a jury, and we have explicitly held that the rule applies when we review nonjury criminal causes (under Rule 772), State v. Devers and Webster, 260 Md. 360, 381, 272 A.2d 794, 805, cert. denied, 404 U.S. 824 (1971); Greene v. State, 229 Md. 432, 433, 184 A.2d 621, 622 (1962) (per curiam), nonjury defective delinquency cases, Johns v. Director, 239 Md. 411, 412, 211 A.2d 751, 752 (1965), child support awards, Wooddy v. Wooddy, 258 Md. 224, 228, 265 A.2d 467, 470 (1970), and child custody cases. Hild v. Hild, 221 Md. 349, 359, 157 A.2d 442, 448 (1960). Since Hild we have consistently applied the "clearly erroneous" portion of Rule 886 (or that standard without citation to the rule) in our review of child custody awards. See, e.g., Hall v. Triche, 258 Md. 385, 386, 266 A.2d 20 (1970) (per curiam); Spencer v. Spencer, 258 Md. 281, 284, 265 A.2d 755, 756 (1970) (per curiam); Goldschmiedt v. Goldschmiedt, 258 Md. 22, 26, 265 A.2d 264, 266 (1970); Franklin v. Franklin, 257 Md. 678, 684, 264 A.2d 829, 832 (1970); Kauten v. Kauten, 257 Md. 10, 12, 261 A.2d 759, 761 (1970); Hardisty v. Salerno, 255 Md. 436, 438, 258 A.2d 209, 210 (1969) (per curiam); Holcomb v. Holcomb, 255 Md. 86, 87-88, 256 A.2d 886, 887 (1969) (per curiam); Orndoff v. Orndoff, 252 Md. 519, 522, 250 A.2d 627, 628 (1969); Cornwell v. Cornwell, 244 Md. 674, 678, 224 A.2d 870, 872-73 (1966); Andrews v. Andrews, 242 Md. 143, 154, 218 A.2d 194, 201 (1966); Daubert v. Daubert, 239 Md. 303, 309, 211 A.2d 323, 327 (1965); Winter v. Crowley, 231 Md. 323, 329, 190 A.2d 87, 90 (1963); Parker v. Parker, 222 Md. 69, 75-76, 158 A.2d 607, 610 (1960). Moreover, even prior to our explicit recognition in Hild of the applicability of Rule 886, our predecessors in essence utilized the clearly erroneous standard when reviewing factual determinations on appeals of child custody actions. See, e.g., Sewell v. Sewell, 218 Md. 63, 71, 145 A.2d 422, 426 (1958); Wilhelm v. Wilhelm, 214 Md. 80, 84, 133 A.2d 423, 425 (1957); Trudeau v. Trudeau, 204 Md. 214, 218, 103 A.2d 563, 564 (1954); Cullotta v. Cullotta, 193 Md. 374, 384, 66 A.2d 919, 924 (1949); Sibley v. Sibley, 187 Md. 358, 362, 50 A.2d 128, 130 (1946).
*124 Having determined that Rule 886 is controlling in child custody cases, we now consider the extent to which the "clearly erroneous" portion of it applies in such appeals. The words of the rule itself make plain that an appellate court cannot set aside factual findings unless they are clearly erroneous, and this is so even when the chancellor has not seen or heard the witnesses. Sewell v. Sewell, 218 Md. 63, 71, 145 A.2d 422, 426 (1958); see, e.g., Dorf v. Skolnik, 280 Md. 101, 117-118, 371 A.2d 1094, 1103 (1977); Chalkley v. Chalkley, 236 Md. 329, 333, 203 A.2d 877, 880 (1964). On the other hand, it is equally obvious that the "clearly erroneous" portion of Rule 886 does not apply to a trial court's determinations of legal questions or conclusions of law based upon findings of fact. See, e.g., Clemson v. Butler Aviation, 266 Md. 666, 671, 296 A.2d 419, 422 (1972); A.S. Abell v. Skeen, 265 Md. 53, 55, 288 A.2d 596, 597 (1972).
Although these two propositions are clear, there is some confusion in our cases with respect to the standard of review applicable to the chancellor's ultimate conclusion as to which party should be awarded custody. Notwithstanding some language in our opinions that this conclusion cannot be set aside unless clearly erroneous, see, e.g., Spencer v. Spencer, 258 Md. 281, 284, 265 A.2d 755, 756 (1970) (per curiam); Goldschmiedt v. Goldschmiedt, 258 Md. 22, 26, 265 A.2d 264, 266 (1970), we believe that, because such a conclusion technically is not a matter of fact, the clearly erroneous standard has no applicability. However, we also repudiate the suggestion contained in some of our predecessors' opinions, see, e.g., Melton v. Connolly, 219 Md. 184, 188, 148 A.2d 387, 389 (1959); Butler v. Perry, 210 Md. 332, 339-40, 123 A.2d 453, 456 (1956); Burns v. Bines, 189 Md. 157, 164, 55 A.2d 487, 490 (1947); cf. Ex Parte Frantum, 214 Md. 100, 105, 133 A.2d 408, 411, cert. denied, 355 U.S. 882 (1957) (adoption case), and relied upon by the Court of Special Appeals in Sullivan v. Auslaender, 12 Md. App. 1, 3-5, 276 A.2d 698, 700-01 (1971), and its progeny, see, e.g., Sartoph v. Sartoph, 31 Md. App. 58, 64 & n. 1, 354 A.2d 467, 471 (1976); Vernon v. Vernon, 30 Md. App. 564, 566, 354 A.2d 222, 224 *125 (1976), that appellate courts must exercise their "own sound judgment" in determining whether the conclusion of the chancellor was the best one. Quite to the contrary, it is within the sound discretion of the chancellor to award custody according to the exigencies of each case, Miller v. Miller, 191 Md. 396, 407, 62 A.2d 293, 298 (1948), and as our decisions indicate, a reviewing court may interfere with such a determination only on a clear showing of abuse of that discretion. See, e.g., Pontorno v. Pontorno, 257 Md. 576, 581, 263 A.2d 820, 822 (1970); Neuwiller v. Neuwiller, 257 Md. 285, 287, 262 A.2d 736, 737 (1970); Kauten v. Kauten, supra, 257 Md. at 13, 261 A.2d at 761; Wood v. Wood, 227 Md. 112, 115, 175 A.2d 573, 575 (1961); Oliver v. Oliver, 217 Md. 222, 230, 140 A.2d 908, 912 (1958); cf. Dorsett v. Dorsett, 281 A.2d 290, 292 (D.C. 1971) (great deference accorded trial judge in child custody cases; no abuse of discretion found); Dinkel v. Dinkel, 322 So.2d 22, 24 (Fla. 1975) (custody determination not reversible except on showing of abuse of discretion); Kauffman v. Kauffman, 30 Ill. App.3d 159, 333 N.E.2d 695, 697 (1975) (custody finding not reversible unless against manifest weight of evidence or "clearly contrary" to best interests of child); Feldman v. Feldman, 55 Mich. App. 147, 222 N.W.2d 2, 3 (1974) (child custody determination not disturbed unless factual findings against great weight of evidence or unless there is abuse of discretion or clear legal error); Pendergraft v. Pendergraft, 23 N.C. App. 307, 208 S.E.2d 887, 889 (1974) (custody award not reversed except on showing of abuse of discretion). See generally 2 W. Nelson, Divorce and Annulment § 15.50 (2d ed. 1961 rev.). Such broad discretion is vested in the chancellor because only he sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; he is in a far better position than is an appellate court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor.
In sum, we point out three distinct aspects of review in child custody disputes. When the appellate court scrutinizes factual findings, the clearly erroneous standard of Rules 886 *126 and 1086 applies.[4] If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion.

(2) Finding of Parent's Adultery as Affecting Award of Custody

The Court of Special Appeals in this case, after taking notice of the chancellor's findings of Mrs. Davis' adulterous conduct, concluded that because a presumption of unfitness had arisen, "[a] showing that she had repented and there was little likelihood of a recurrence of these actions was mandatory." 33 Md. App. at 302-03, 364 A.2d at 134. Premised on the ground that this requirement violated her rights to be free from compulsory self-incrimination, U.S. Const., Amend. V; Md. Decl. of Rts., Art. 22, Mrs. Davis argues that the Court of Special Appeals erred in applying it. Although we agree with the petitioner that the Court of Special Appeals applied the wrong standard, we reach that conclusion by a different route, and find it unnecessary to pass on the constitutional issues.
The Maryland Reports are filled with decisions which discuss the effect a parent's adulterous conduct has on the award of custody. Although our prior decisions recognized that one who has engaged in adultery is not ipso facto unfit to have custody, see, e.g., Orndoff v. Orndoff, 252 Md. 519, 522, 250 A.2d 627, 628 (1969); Cornwell v. Cornwell, 244 Md. 674, 679, 224 A.2d 870, 873 (1966), our predecessors held that a "strong presumption" of unfitness arises which only a "strong showing" of facts evidencing fitness will overcome. *127 See, e.g., Shanbarker v. Dalton, 251 Md. 252, 257, 247 A.2d 278, 281 (1968); Bray v. Bray, 225 Md. 476, 482-83, 171 A.2d 500, 504 (1961). Such decisions point out that this rule was not formulated to punish the guilty parent, but rather was based on the presumption that adultery is a "highly persuasive indicium" that the offending person is not the better of the two to raise the child. See, e.g., Palmer v. Palmer, 238 Md. 327, 331, 207 A.2d 481, 483 (1965); Wallis v. Wallis, 235 Md. 33, 36-37, 200 A.2d 164, 165-66 (1964).
Perhaps in response to the rapid social and moral changes in our society, two of this Court's most recent cases have implicitly recognized that a finding of adultery per se no longer is a "highly persuasive indicium" of unfitness to have custody of one's child. In Pontorno v. Pontorno, supra, 257 Md. at 580, 263 A.2d at 822, Judge Finan for the Court, without mention of any presumption of unfitness, stated that "a finding of adultery is relevant to the extent that it may affect the welfare of the children." And in Neuwiller v. Neuwiller, supra, 257 Md. at 286, 262 A.2d at 737, this Court, again speaking through Judge Finan, held that where adulterous behavior is "not determinative of the central issue [as to] who will further the best interests of the child," an infant may be awarded to a mother despite the fact that there is no showing that she had discontinued her conduct. Cf. Hild v. Hild, 221 Md. 349, 363-64, 157 A.2d 442, 450 (1960) (Hammond, J., dissenting) (adultery should not create presumption of unfitness, but should be weighed by trier of fact in relation to individuals in each case). We now explicitly hold what the Pontorno and Neuwiller cases implicitly recognized, i.e., that whereas the fact of adultery may be a relevant consideration in child custody awards, no presumption of unfitness on the part of the adulterous parent arises from it; rather it should be weighed, along with all other pertinent factors, only insofar as it affects the child's welfare. We note that this view is in accord with the decisions of the majority of other courts around the country. See, e.g., Dinkel v. Dinkel, supra, 322 So.2d at 24; Lockard v. Lockard, 193 Neb. 400, 227 N.W.2d 581, 583 (1975); Commonwealth of Pa. ex rel. Myers v. Myers, 360 A.2d *128 587, 590 (Pa. 1976). See generally Annot., 23 A.L.R.3d 6, 38-42 (1969).

(3) The Present Case

We now return to a consideration of the custody award by Judge Latham in this case. The chancellor had the benefit of several sources of information, gathered over a prolonged period of time, to aid his determination of what custodial arrangement would be in the best interests of Leigh. On January 10, 1975, a hearing was held before a domestic relations master in connection with the pendente lite custody of the three minor children. Six witnesses testified at that hearing: Mr. Davis and a private investigator hired by him, as well as Mrs. Davis, two of Leigh's teachers and one of the petitioner's neighbors. Rejecting Mr. Davis' contention that his wife was unfit to be custodian of Leigh, the master made the following findings and recommendation in the report:
This Master has carefully considered the testimony adduced. While it may be that Mrs. Davis has, on occasion, shown what might be charactered as poor judgment in her association with other men, she has, in the opinion of this Master, (at least on the record of the hearing) sequestered the minor daughter from her association with her two (2) male friends. The Master does not feel that such association as has been shown clearly by the testimony to exist, is such as would warrant, at least on a pendente lite basis, the removal of the child from the custody of the mother. Katherine Leigh is adequately housed and clothed and attends a school not too far from her home. She appears to be doing well in school and has a competent sitter located in the same building in which the child lives, with a playmate her own age with whom to associate, who is the child of the same sitter.
*129 At the May 21 and 22, 1975 divorce and custody proceedings before Judge Latham, Mr. Davis, together with three private investigators, sought to establish the adulterous conduct of his wife and her unfitness to be awarded permanent custody of Leigh. Mrs. Davis, along with several neighbors and babysitters of Leigh as well as her two teachers, sought to convince the court that the mother's continued custody would be in Leigh's best interests.
Before Judge Latham ultimately made his decision as to the custody of the children (the divorce having been decreed in July), he had the benefit of a further hearing as well as the report of the court investigator. At a December 11, 1975 hearing, Mr. Davis again testified on his own behalf, and called two witnesses who were neighbors and potential babysitters for Leigh; he also interrogated his former wife. The court-ordered report contained additional information bearing on the fitness of both parties to have permanent custody of Leigh.[5] The investigator, after having interviewed both parents and all three children, found no evidence of sexual misconduct by Mrs. Davis beyond February 1975, and recommended that the present arrangement (John and Mary with Mr. Davis and Leigh with Mrs. Davis) be continued since "[a]ny adjustment by the children that was necessary had been made, and now they seem to have come to terms with the family situation."
Because we must determine whether the chancellor's findings of fact were clearly erroneous, whether he made any errors of law, or whether he abused his discretion in *130 awarding custody of Leigh to her mother, we here quote his oral opinion in full:
Gentlemen, I have, of course, heard all of the testimony in connection with the original trial of this case, which consumed a couple of days, and I have had the benefit of reviewing that transcript, and I have had the benefit of our custodial investigation in connection with the three children.
It's obvious to me that Mr. Davis can and has provided an adequate or even more than adequate home for the two older children, and certainly on the basis of their latest report cards, and the custodial investigation report they are doing well with him.
It's equally obvious to me that Mrs. Davis is able to and has been providing an adequate home for the youngest daughter, Leigh. It's quite obvious to me that she would be unable to remain where she is if the Court awarded her custody of all three of the children, but I don't intend to do that, so it's not necessary to really even discuss that aspect of the case.
The primary concern of the Court in this particular case has been the younger child, Leigh, who has been with her mother, and as to whether that should be at least a temporary, permanent arrangement, or whether the custody should be changed to the father.
Being aware of the law in reference to the adultery of the mother and the presumptions that arise from it, at the same time we must consider that the law in the State of Maryland is, and has been for some time, that the best interests of the child is the paramount consideration that the Court should consider.
The present situation, obviously whenever a father and mother are divorced, and children are separated, is not very desirable. At the same time, *131 for a substantial period of time, well in excess of a year, the present arrangement has been in effect, and has apparently been working. That is not to say that if Mr. Davis had had Leigh during that period of time that she might not have made the same progress in school, and in her upbringing as she has with her mother. At the same time, the Court, based on all the information in this case, is reluctant at this point to make any change in the custody of Leigh, because I think that that would not be in her best interests.
Now, I am mindful though of the fact that, and as you had indicated, Mr. Foley [(respondent's attorney)], this is something that the Court has the right to review, and I would certainly expect to review it very carefully if at any time any information was brought to the Court's attention that she was, Mrs. Davis was conducting herself in any way that made it inadvisable to keep the custody of Leigh with her.
Initially, we note that none of the chancellor's findings of fact is clearly erroneous  in reality, there appear to be no factual matters that ever were seriously in dispute. We also conclude that the chancellor recognized that the law requires custody to be awarded so as to further the best interests and welfare of the child. It is obvious that in effectuating this legal mandate, Judge Latham took into account the crucial factors present here, among them: that Leigh had been living with her mother alone for the past two years and was adjusted to this arrangement; that she was doing well in school and was adequately provided for at home; that even though Mrs. Davis had engaged in adulterous conduct in the past, there was no showing that it had ever deleteriously affected Leigh; and that there was uncontroverted evidence that Mrs. Davis had engaged in no sexual misconduct since February 1975. We discern no abuse of discretion. A case such as this, where custody might well have been awarded to either parent, aptly demonstrates the advisability of leaving *132 to the chancellor the delicate weighing process necessary in child custody cases; to disturb the award here would require that we substitute our judgment for that of the chancellor, and an appellate court sits in a much less advantageous position to assure that the child's welfare is best promoted.
Judgment of the Court of Special Appeals reversed.
Case remanded to that court with directions that it affirm the order of the Circuit Court for Montgomery County.
Costs to be paid by respondent.
NOTES
[1] We are referring, of course, to the story of King Solomon in the Bible. 1 Kings 3:16. The reluctance of appellate courts to play "super Solomon" was referred to in a recent decision of Pennsylvania's intermediate appellate court. Commonwealth ex rel. Myers v. Myers, 237 Pa. Super. Ct. 192, 352 A.2d 458, 459 (1975), rev'd. Pa., 360 A.2d 587 (1976).
[2] Mrs. Davis did not cross-appeal the custody award of John and Mary to Mr. Davis and, therefore, the only question before the Court of Special Appeals was the custody of Leigh.
[3] Since Rules 886 and 1086 are identical, what we say with respect to one is equally applicable to the other.
[4] We note that when it appears on review that the chancellor failed to take sufficient evidence into account, we may remand the case without affirmance or reversal for a redetermination, after further proceedings, as to what is in the best interests of the children. See, e.g., Ouellette v. Ouellete, 246 Md. 604, 608-09, 229 A.2d 129, 131, (1967); Jester v. Jester, 246 Md. 162, 171, 228 A.2d 829, 834 (1967); Md. Rule 871 a.
[5] Although the investigator's report was never received into evidence, it is clear from the record that both parties studied it and that the court thought it unnecessary to formally admit it into evidence at the December 11, 1975 hearing. Judge Latham remarked at that time:

It can be introduced and made a part of the evidence, if anybody wants to do it that way. On the other hand, it's not necessary. I have fully read the report on several occasions, as I previously indicated, and whether I agree with everything it says or not remains to be seen.
No one contends that the report is not part of the record on appeal, and we treat it as though it had been formally admitted into evidence at trial. State Hwy. Adm. v. Transamerica Ins., 278 Md. 690, 701, 367 A.2d 509, 516 (1976).